**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

**DONNA WITT and GREGORY WORRELL,**

                         **Plaintiffs,**          **03-CV-0397A(Sr)**

**v.**

**NEW YORK STATE POLICE, et al.,**

                         **Defendants.**

---

## REPORT, RECOMMENDATION AND ORDER

This matter was referred to the undersigned by the Hon. Richard J. Arcara, in accordance with 28 U.S.C. § 636(b), for all pretrial matters and to hear and report upon dispositive motions.  Dkt. #5.


Currently before the Court are the following motions:

1.  Captain Edward P. Moffe's ("Captain Moffe's"), motion (Dkt. #26), for summary judgment;

2.  The New York State Police's ("State Police's"), motion (Dkt. #30), for summary judgment; and

3.  Zone Sergeant Gary M. Segrue's ("Z/Sgt. Segrue's"), motion (Dkt. #38), for summary judgment.

For the following reasons, it is recommended that Captain Moffe's motion be granted; the State Police's motion be granted in part and denied in part; and Z/Sgt. Segrue's motion be granted.

**BACKGROUND**

Upon his promotion to Captain on April 5, 2001, Captain Moffe served as Zone Commander for the State Police Troop A – Zone III, based out of SP Jamestown. Dkt. #28, ¶ 3.  Three Zone Sergeants reported directly to Captain Moffe, including Z/Sgt. Segrue, who was promoted and appointed Zone Sergeant of Troop A – Zone III in August of 2001.[1]  Dkt. #28, ¶ ¶ 4 & 6.  Z/Sgt. Segrue's duties included oversight of the administrative operations at SP Jamestown.  Dkt. #28, ¶ 7.

Plaintiff Donna Witt has been a civilian employee of the State Police for more than twenty years.  Dkt. #28, ¶ 1; Dkt. #54, ¶ 2.  She currently holds the job title of Zone Secretary Keyboard Specialist II and provides administrative support to the Zone Commander and Zone Sergeants at SP Jamestown.  Dkt. #28, ¶ 1.

---

[1] Prior to his promotion to Zone Sergeant, Ms. Witt had limited interaction with Sgt. Segrue. Dkt. #33, p.69. However, she recalls one incident in 1998 when Sgt. Segrue made a derogatory remark to another person about women and age and then glanced at Ms. Witt, who was checking people in as they arrived for a retirement party. Dkt. #54, ¶ 6a.  She also recalled an incident in 1999 when she was asked to deliver some papers to Sgt. Segrue and he ignored her presence.  Dkt. #33, p.69; Dkt. #54, ¶ 6b.  She states that Sgt. Segrue would fail to acknowledge her presence in a room or respond to her greetings. Dkt. #54, ¶ 6f.

In early  2001, the station was moving to a new location.  Dkt. #54, ¶ 16.  On her last day at the old building, she asked another Sergeant to assist her in transporting her belongings to the new building. Dkt. #54, ¶ 17.  The Sergeant agreed, but then observed Sgt. Segrue moving his belongings in a conversion van, and asked him if he had room for Ms. Witt's belongings.  Dkt. #54, ¶ 17.  The Sergeant informed Ms. Witt that Sgt. Segrue was reluctant to transport her belongings until another sergeant instructed him to do so.  Dkt. #54, ¶ 17.

Ms. Witt had ordered a bookcase and a cart for the fax machine in her new office, but she did not receive them when the furniture was delivered.  Dkt. #54, ¶ 16.  Ms. Witt discovered the bookcase in a closet and believes that Sgt. Segrue purposely withheld it from her.  Dkt. #54, ¶ 16.  She also observed that the cart she had ordered for the fax machine had been utilized for the Breathalyzer machine. Dkt. #54, ¶ 18.  When the stand for the Breathalyzer machine was delivered, Ms. Witt responded to Dispatcher Milliman's inquiry as to who had ordered the cart, to which Sgt. Segrue responded, "And she ain't ever gonna get it."  Dkt. #54, ¶ 18.  The cart was stored in the basement and Ms. Witt used an old microwave cart for the fax machine.  Dkt. #54, ¶ 18.

Plaintiff Gregory Worrell is a Zone Sergeant with the State Police.   Dkt. #28, ¶ 2.   During the time period at issue, Z/Sgt. Worrell's job duties included serving as an EEO Specialist at SP Jamestown.  Dkt. #28, ¶ 2.

In November of 2001, Captain Moffe asked Ms. Witt how the Zone was functioning and how she was getting along with Z/Sgt. Segrue.  Dkt. #54, ¶ 29.  After some coaxing from Captain Moffe, Ms. Witt revealed to him that she hated her job because Z/Sgt. Segrue treated her poorly and acted as though he didn't like her.  Dkt. #54, ¶ 29.  Thereafter, Captain Moffe called Z/Sgt. Worrell into his office, commented on the friction between Ms. Witt and Z/Sgt. Segrue and informed Z/Sgt. Worrell, "We have to do something about Donna.  We have to reel her in."  Dkt. #55, ¶ 12.  When Z/Sgt. Worrell responded that the problem was Z/Sgt. Segrue, Captain Moffe acknowledged to Z/Sgt. Worrell that Z/Sgt. Segrue did not have good people skills.  Dkt. #55, ¶ 12.

On February 14, 2002, Sgt. Kelly informed Captain Moffe that a communications specialist "appeared to be distant from her duties," and "was not quite herself."  Dkt. #33, p.113.  Captain Moffe observed that the communication specialists' personal hygiene was poor.  Dkt. #33, p.115.  Captain Moffe convened a meeting with Sgt. Kelly, Z/Sgt. Segrue and Ms. Witt to discuss whether the communication specialists' condition was creating an officer safety issue.  Dkt. #33, p.113.  During the course of the discussion, Z/Sgt. Segrue commented that if the communications specialist could not perform her duties, she could become the zone secretary.  Dkt.

-3-

#33, p.113.  According to Sgt. Kelly,

> Sergeant Segrue looked at Captain Moffe, and they both
> began to laugh at the statement.  At first I believed it was a
> joke that Donna Witt would laugh at too, but when I looked
> at her, she was looking at the floor and appeared to be
> upset.  The meeting ended shortly after Zone Sergeant
> Segrue's comment without resolving any of the issues that
> we were talking about.
>
> [Sgt. Kelly] had the occasion to speak with Zone
> secretary Donna Witt approximately one week after the
> meeting in the Captain's office. [Sgt. Kelly] was advised by
> Donna Witt that the comment made by Zone Sergeant
> Segrue regarding Communication Specialist . . . becoming
> the zone secretary had offended her.  Donna Witt further
> stated that comments like this were a common occurrence
> by Zone Sergeant Segrue towards her, and that she did not
> welcome any comments because she felt the were
> inappropriate.

Dkt. #33, p.113.  Ms. Witt later explained that she didn't know if Z/Sgt. Segrue was

questioning her cleanliness, her work ability, or both, and was insulted by the remarks.

Dkt. #33, p.71.  Z/Sgt. Segrue explained that he believed that Captain Moffe was

overreacting to the situation and recalled that he suggested "we can make her a Zone

Secretary" as a jab at Captain Moffe.  Dkt. #33, p.169.  Z/Sgt. Segrue denied  any intent

to insult Ms. Witt.  Dkt. #33, p.169.


On February 20, 2002, Sgt. Melissa Schreader reported to Z/Sgt. Segrue

that a trooper had been insubordinate to her, failed to respond to her calls while on

patrol, and when contacted, challenged her request that he respond to a call of

domestic disturbance.  Dkt. #33, pp.158 & 432-34.  Z/Sgt. Segrue traveled to SP

Fredonia to assist Sgt. Schreader and informed Captain Moffe about the incident.  Dkt.

#33, pp.158-159.  Captain Moffe initiated a personnel complaint against the trooper and

the State Police initiated an investigation on February 28, 2002.  Dkt. #33, p.159; Dkt. #59, ¶ 27.  Captain Moffe requested Z/Sgt. Worrell's assistance in the investigation of this matter, however, Z/Sgt. Worrell was only aware that the investigation involved the trooper's failure to respond to a radio call.  Dkt. #33, p.340; Dkt. #55, ¶ 20.

On March 6, 2002, Ms. Witt was in the communications area talking with a group of people, including Sgt. MacLaughlin, Communications Specialist Chwalek, Sgt. Kelly, and Trooper Wysocki.  Dkt. #33, p.71.  Trooper Wysocki said something to the effect that Ms. Witt deserved a raise for her hard work.  Dkt. #33, p.71.  Communications Specialist Chwalek laughed as she left the room.  Dkt. #33, p.71.  Ms. Witt replied that maybe she just needed a drink.  Dkt. #33, p.71.  Z/Sgt. Segrue walked by and said something which Ms. Witt heard as "Yeah, working too hard spreading."  Dkt. #33, p.71.  Ms. Witt asked Trooper Wysocki what Z/Sgt. Segrue said and Trooper Wysocki stated that she heard Z/Sgt. Segrue say "working too hard spreading."  Dkt. #33, pp.71-72.  Trooper Wysocki recounted that she heard Z/Sgt. Segrue say something to the effect of "spread them" or "You gotta spread them," which she interpreted as an inappropriate "sexual type of thing."  Dkt. #33, pp.93-94.  Trooper Wysocki observed that Ms. Witt was "very shaken up."  Dkt. #33, p.93.  Z/Sgt. Segrue recalled the incident as follows:

> Sergeant MacLaughlin was talking about how busy he was
> . . . . Donna was talking about how busy she was in the
> back.  Sally was talking about how busy she was.  They
> were out there for probably 30 to 40 minutes conversing,
> talking about the job, talking about training they were going
> to receive or had received . . . and how they anticipated a
> bump in pay and . . . talking about the current contract
> situation, but they had been out there for probably 30 to 40
> minutes.

* * *

> . . . I brought in some papers to put in the shredder box . . . I
> was still listening to the conversation and I walked sort of out
> of the room and I said, "You guys are all real busy spreading
> rumors" and I continued to walk.  I remember Donna Witt
> turning and saying, "What did he say guys? What did he
> say?" and she was laughing at the time.  So, I know she
> didn't hear the comment I made and I continued to walk and
> go back and do my business in the Zone office.

Dkt. #33, p.170.

On March 7, 2002, Z/Sgt. Worrell spoke to communication specialist

Karen Buvoltz, who suggested that the radio may have been off when Sgt. Schreader

was attempting to contact the trooper on February 20, 2002.  Dkt. #59, ¶ 28.  Ms.

Buvoltz also suggested to Z/Sgt. Worrell that there might be an EEO issue arising from

religious differences between the trooper and Sgt. Schreader.  Dkt. #55, ¶ 21.

On March 8, 2002, Z/Sgt. Worrell informed Communications Specialist

Buvoltz that he was looking into a sexual harassment complaint against Z/Sgt. Segrue

and detailed the alleged incident.  Dkt. #33, pp.160 & 192-193.

On March 8, 2002, Z/Sgt. Worrell asked Sgt. Schreader if he could speak

to her regarding the complaint against the trooper.  Dkt. #33, p.162.  Sgt. Schreader

stated that she informed Z/Sgt. Worrell that Captain Moffe had ordered her not to talk

about the investigation, but Z/Sgt. Worrell advised her that the conversation was

confidential.  Dkt. #33, p.162.  According to Sgt. Schreader,

Zone Sergeant Worrell began by saying that he thought Captain Moffe had gone to [sic] far and that this could have been handled in house. Zone Sergeant Worrell also stated that Captain Moffe had no previous incidents to back up the investigation and that in the end he (Captain Moffe), Zone Sergeant Gary Segrue and myself would all end up looking like buffoons. I then explained to Zone Sergeant Worrell the events that had occurred on February 20, 2002 that had brought about the investigation. Upon completion, Zone Sergeant Worrell stated that Captain Moffe and Zone Sergeant Segrue had other motives for bringing about the investigation and that they were just using me. I then commented that if they had other motives that was no concern of mine but that I had felt that what [the trooper] had done was wrong. Zone Sergeant Worrell then stated that he realized that it was Captain Moffe who was the complainant and that he (Zone Sergeant Worrell) was aware that I did not want to make a personnel complaint against [the trooper]. I did not confirm or deny this information. Zone Sergeant Worrell then stated that at a previous date Zone Sergeant Segrue had entered the communications room at SP Jamestown and had commented to Zone Secretary Donna Witt that she was spreading. Zone Sergeant Worrell also said that Miss Witt was not sure what to do but he had told her that if she didn't do something about it then he would. I gave no response to this because the comment that Zone Sergeant Segrue was alleged to have said made no sense to me. This ended the conversation. No explanation was given to me as to why he (Zone Sergeant Worrell) was sharing this information.

Dkt. #33, pp.162-163.


Z/Sgt. Worrell recounts that he advised Sgt. Schreader that Ms. Buvoltz believed that the radio was turned off at the time she was attempting to contact the trooper and asked her if she thought she should advise Captain Moffe of this possibility. Dkt. #55, ¶ 22. Investigator Feldman recalled that he was speaking with Z/Sgt. Worrell in his office when Sgt. Schreader came in to get a cup of coffee. Dkt. #33, p.314. Z/Sgt. Worrell asked Sgt. Schreader a question about the radio on the date of the

incident with the trooper.  Dkt. #33, pp.314 & 316.  Investigator Feldman did not recall

Sgt. Schreader's response, but stated:

> there was a second question posed by Zone
> Sergeant Worrell . . . I didn't find any relevance in
> it [sic] it had something to do – it was a followup
> question to his first question – and I believe it was
> something to the effect of "well, don't you think
> that's important" or "isn't that important" or
> something along those lines.  And, again, I don't
> even recall what Sergeant Schreader's response
> [was] to that followup question.
>
> Q.   Do you recall any other details of their
>       conversation?
>
> A.   It's my recollection that . . . ended the
>       conversation with Sergeant Schreader leaving my
>       office either [sic] that point or shortly thereafter.  I
>       don't recall them having any other
>       question/answer or any other conversations about
>       it.  There may have been but I don't recall it.
>
> Q.   How long would you estimate their conversation
>       lasted for?
>
> A.   I would say it was only a few minutes.  Again, if
>       there was more to it [than] that I wasn't paying
>       attention to [it] but it's truly my believe [sic] that
>       this lasted two/three minutes.
>
> Q.   What were you doing . . . during the conversation?
>
> A.   I was actually making funeral arrangements for a
>       retired trooper that had passed away.

Dkt. #33, p.316-17.


On March 11, 2002, Z/Sgt. Worrell sent an e-mail to Senior Investigator

June Bradley, who was assigned to equal employment opportunity matters within the

office of human resources.  Dkt. #59, ¶ 8.  That e-mail provided as follows:

> I have a problem here in Zone 3 and I need your advise [sic]
> on how to approach it.  Our Zone secretary, Donna Witt, is
> about to go off the "deep end" if she hasn't already, because
> of the treatment she is receiving from our Captain (Moffe)
> and Z/Sgt Segrue.  Segrue and Moffe are very close friends
> and if I were to approach either one of them about this
> situation I feel that it wouldn't be handled by them properly
> and without retaliation towards me and especially toward
> Donna.  I'll relate to you the two most recent episodes.

Dkt. #33, p.35.  Z/Sgt. Worrell recounted the incident in which Z/Sgt. Segrue stated that

the Communications Specialist could become the zone secretary and the incident in

which Z/Sgt. Segrue stated Ms. Witt was "spreading."  Dkt. #33, p.35.  Z/Sgt. Worrell

then stated:

> My dilemma . . . I have to work with the guy, and the Captain
> will not tolerate me going outside the Zone with this problem.
> Something has to be done.  I don't feel that the Captain
> would take this seriously and properly.  What do we do?

Dkt. #33, p.35.  Z/Sgt. Worrell made the complaint in his role as supervisor.  Dkt. #60,

¶ 25.  Senior Investigator Bradley and Captain Coots, of the internal affairs division,

were assigned to investigate the matter as a complaint of personnel investigation.  Dkt.

#33, p.37; Dkt. #59, ¶ 9.


Om March 15, 2002, the internal affairs bureau began investigating a

personnel complaint alleging that Z/Sgt. Segrue was aware that another trooper had

been involved in a domestic incident, but failed to initiate a personnel complaint against

the trooper.  Dkt. #33, ¶ 7.

On March 16, 2002, Ms. Witt provided a statement regarding Z/Sgt.

Segrue, in which she described the incidents set forth above and noted that:

> Zone Sergeant Segrue has been rude to other people.  This
> includes Troopers and other Sergeants.  His behavior
> consists of looking at people in such a way that it can only
> be interpreted as negative.  He is equally condescending to
> both sworn and non-sworn employees.

Dkt. #33, p.69.  She also stated that:

> I think that Segrue has a problem with my circle of friends.
> Nine out of ten people have had a problem with him at one
> time or another.  He is rude and condescending.  Due to
> this, Trooper morale bottomed out when Segrue became
> Station Commander.

Dkt. #33, p.70.  She further stated that:

> Segrue treats everyone poorly.  I can't attribute it to gender
> or race specifically.

Dkt. #33, p.71.


On March 27, 2002, Z/Sgt. Worrell advised Captain Moffe, in the

presence of several officers who were not involved in the investigation, that it was his

opinion that the trooper had failed to respond to Sgt. Schreader's calls because the

radio was turned off.  Dkt. #33, p.340.


On March 31, 2002, Captain Moffe called Z/Sgt. Worrell and asked him

what he knew about the EEO complaint that Ms. Witt had filed against Z/Sgt. Segrue.

Dkt. #55, ¶ 23.  Z/Sgt. Worrell explained to Captain Moffe that he had filed the

complaint and, when asked by Captain Moffe why Ms. Witt had not come to him with

her complaint, Z/Sgt. Worrell explained that Ms. Witt felt that she could not tell him

-10-

because of relationship he had with Z/Sgt. Segrue, and her belief that Captain Moffe would not take her complaint seriously.  Dkt. #55, ¶ 25.  Captain Moffe told Z/Sgt. Worrell that it was very unfortunate that he had filed the complaint.  Dkt. #55, ¶ 26.

Ms. Witt claims that, because of stress, she called in sick to work on April 2-4, 2002.  Dkt. #59, ¶ 23.

On April 12, 2002, Z/Sgt. Segrue was informed that he would be suspended with pay, effective April 15, 2002, as a result of the investigation relating to his failure to initiate a personnel complaint against a trooper following that trooper's involvement in a domestic incident.  Dkt. #36, ¶ 27.

On April 18, 2002, Captain Moffe was completing his tour of duty and went into the room in which he had been sleeping during his workweek to change into civilian clothing and gather his laundry to take home with him.  Dkt. #59, ¶ 18.  He carried his laundry basket out to his car and, when he returned, observed a pair of red thong underwear on the floor in the hallway.  Dkt. #59, ¶ 18.  Captain Moffe pointed to the underwear and asked Ms. Witt whether someone was playing a joke on them.  Dkt. #59, ¶ 19.  Ms. Witt responded by suggesting "maybe someone threw in the towel." Dkt. #54, ¶ 47.  Shortly thereafter, Ms. Witt walked down the hall and observed the underwear on the floor.  Dkt. #54, ¶ 48.  Ms. Witt called the station cleaner, Diane Barber, and Communications Specialist Sally Chwalek over to look at the underwear on the floor.  Dkt. #54, ¶ 49.  When Sgt. Kelly walked by and observed the underwear, he

got some paper towels and disposed of them in the trash.  Dkt. #54, ¶ 50.  Before he

left the station, Captain Moffe directed Ms. Witt to make sure that the underwear was

not misplaced evidence.  Dkt. #59, ¶ 19.


        Captain Moffe left the station and received a telephone call from Sgt. Kelly

informing him that the station cleaner, Diane Barber had gone home because she was

so upset about seeing the underwear on the floor.  Dkt. #32, pp.184-85.  Captain Moffe

directed Sgt. Kelly to retrieve the underwear and place it in the evidence locker.  Dkt.

#32, p.185.  Captain Moffe attempted to call Diane Barber to ascertain why she was so

upset, but could not reach her.  Dkt. #32, p.186.  He then called Ms. Witt at home.  Dkt.

#32, p.186.


        Captain Moffe recalls that Ms. Witt told him that she "thought it was

funny."  Dkt. #186, p.182.  Captain Moffe also telephoned Sally Chwalek, who was

working at the time, and asked her if she was upset by the incident.  Dkt. #32, p.187.

Captain Moffe recalls that Ms. Chwalek told him that she was not upset, but "felt that if it

was a joke it was in poor taste."  Dkt. #32, p.187.  When Captain Moffe finally reached

Ms. Barber, she explained that "she couldn't believe that with everything going on in the

station, everything with Sergeant Segrue, why somebody would do that."  Dkt. #32,

p.188.  Captain Moffe made several more phone calls to Sgt. Kelly and Ms. Witt to

discuss how they could determine who may have put the underwear there.  Dkt. #32,

p.190.   He was determined to resolve the matter because he wanted to halt the

"paranoia" within the Zone.  Dkt. #32, p.191.

The next morning, Captain Moffe realized that the underwear belonged to his daughter.  Dkt. #32, p.196-198.  Ultimately, Captain Moffe was counseled regarding his handling of this incident.  Dkt. #33, p.231.  Ms. Witt claims that the stress from this incident caused her to call in sick on April 19, 2002.  Dkt. #59, ¶ 23.

On April 24, 2002, Communications Specialist Karen Buvoltz and Sgt. Schreader informed Captain Moffe of their respective conversations with Z/Sgt. Worrell on March 8, 2002.  Dkt. #33, p.238.  Captain Moffe initiated a complaint of investigation against Zone Sergeant Worrell on April 24, 2002.  Dkt. #61, p.46.

On April 25, 2002, Captain Moffe wrote a memorandum directing Z/Sgt. Worrell to refrain from discussing and/or soliciting information concerning the personnel complaints concerning the trooper in SP Fredonia and Z/Sgt. Segrue, as well as the EEO issue concerning Ms. Witt.  Dkt. #33, p.344.  The memo also directed Z/Sgt. Worrell to notify Captain Moffe of any requests for assistance regarding these investigations.  Dkt. #33, p.344.  Colonel Campbell testified that she was concerned about this order because it directed Z/Sgt. Worrell to violate protocol for EEO matters, which required reporting directly to human resources rather than through the chain of command.  Dkt. #58-3, p.43.

Also on April 25, 2002, Major McManus, the Troop A Commander, telephoned Captain Coots at the Internal Affairs Bureau and requested that a personnel complaint be initiated against Z/Sgt. Worrell.  Dkt. #57-2, p.62.  Captain Coots advised Major McManus that he did not believe a personnel complaint was warranted.  Dkt.

#57-2, p.62.  Captain Coots discussed the matter with Investigator Hoffman, who

agreed.  Dkt. #57-2, p.62.  Captain Moffe noted in his diary a telephone discussion with

Major McManus regarding Z/Sgt. Worrell on Sunday, April 28, 2002.  Dkt. #53, Exh. YY.

Captain Coots met with Captain Moffe on April 30, 2002.  Dkt. #53, Exh.

UU.  On the same date, Captain Moffe's diary notes "initiate [personnel complaint]

against [Z/Sgt.] Worrell."  Dkt. #53, Exh. YY.

On May 2, 2002, Investigator Feldman was in the front office when he

received a telephone call directing him to report to Batavia the following day to provide

a statement regarding Z/Sgt. Worrell's conversation with Sgt. Schreader on March 8,

2002.  Dkt. #58-2, pp.21-22.  Investigator Feldman stated:

> At this time, Zone III of Troop A was consumed with ongoing
> personal [sic] complaints involving Sgt. Gary Segrue and
> other Division members which writer wanted to remain
> uninvolved in.  After hanging up with Lt. Lyons, writer used
> poor judgment and made statements aloud about Sgt.
> Schreader instituting a personnel complaint against Z/Sgt.
> Worrell and involving writer in this complaint as a witness.
> Writer's comments were relayed to Captain Edward Moffe
> who responded to SP Fredonia to meet with writer about
> these comments.  During this conversation, Capt. Moffe
> repeatedly reminded writer that his statement with Lt. Lyons
> should reflect only the facts of the conversation between
> Z/Sgt. Worrell and Sgt. Schreader and should not contain
> writer's opinions about Capt. Moffe's handling of the Sgt.
> Segrue complaint or that writer's post telephone call
> statement about Sgt. Schreader could be the subject of a
> personnel complaint against writer.

Dkt. #57-4, p.28.  At his deposition, Investigator Feldman testified that Captain Moffe

> kept relating that I had to go give a statement the following
> day, and that that statement – can't quote him – but better

-14-

> be good or . . . better not say anything about him because
> what I had just done in front of Ms. Buvoltz constituted a
> personnel complaint that he could file against me.

Dkt. #58-2, p.25.  Investigator Feldman testified that

> I think what he was trying to do, and I didn't ask him this, but
> I think he was trying to direct my testimony to be very short
> and direct and not to defend [Z/Sgt. Worrell] in any way.  He
> was aware of my friendship with [Z/Sgt. Worrell] and he tried
> to explain to me on this day that what  [Z/Sgt. Worrell] did
> was wrong because he had been ordered not to do it.  I told
> him . . . what occurred in that office, and I also relayed my
> opinions to him about all of this, and it just precipitated
> continuing arguments between us.

Dkt. #58-2, p.26.  Specifically, Investigator Feldman opined to Captain Moffe that "a lot

of what was going on shouldn't be personnel complaints."  Dkt. #58-2, p.27.

Investigator Feldman believed that Captain Moffe intended his comments as a threat.

Dkt. #58-2, p.27.  Investigator Feldman chose not to file a complaint, because he "didn't

want anymore personnel complaints going on in the Zone."  Dkt. #58-2, p.31.


Ms. Witt claims that stress also caused her to call in sick on May 3, 2002.

Dkt. #59, ¶ 23.


By memorandum dated May 5, 2002, 41 members of Zone III advised the

Troop Commander of their support for Z/Sgt. Worrell, noting that

> During the current state of disorder in Zone III, Zone
> Sergeant Worrell has been a voice of reason.  Through his
> own style, he has kept insignificant talk from becoming
> something of a controversy.
>
> Zone Sergeant Gregory J. Worrell continuously works
> in a professional manner, building on Supervisor-Trooper
> relations while still effectively carrying out his duties as a

-15-

> supervisor.  His honesty and integrity are beyond reproach.
> Any problems with supervision in Zone III, factual or
> perceived, were not caused by Zone Sergeant Worrell.  He
> has been a supervisor we could look to for stability even in
> times of turmoil.

Dkt. #58-5, p.25.


On May 13, 2002, Staff Inspector John E. Wood released his report with respect to the personnel investigation of Z/Sgt. Segrue.  Dkt. #33, p.46.  During the course of their investigation of Ms. Witt's allegations, it was revealed that Z/Sgt. Segrue displayed his middle finger to Sgt. Jackson at a promotional party at a bar on August 12, 2001 and told her to "sit your cunt down."  Dkt. #33, pp.46 & 105-06.  Ms. Witt did not observe these interactions between Z/Sgt. Segrue and Sgt. Jackson, but was aware that they occurred.  Dkt. #33, p.52.  The investigation also revealed that Z/Sgt. Segrue repeatedly referred to Sgt. Jackson as Trooper Murray's girlfriend, despite Trooper Murray explaining that they were simply friends and requesting that he stop.  Dkt. #33, pp.46 & 62.  The investigation determined that Z/Sgt. Segrue

> did make the following two comments to or in the presence
> of Ms. Witt: On February 14, 2002, in response to discussion
> concerning Communication Specialist . . . Zone Sergeant
> Segrue stated, "We can make her a Zone Secretary."  On
> March 6, 2002, in response to a general conversation in the
> dispatch center at SP Jamestown, Zone Sergeant Segrue
> stated, "You guys are all real busy spreading rumors."  Ms.
> Witt had made the allegations that these two comments
> were directed specifically at her and that the first comment
> was taken as an insult to her work ability.  The second
> comment was heard by Ms. Witt as, "Working too hard
> spreading."  She perceived this as having sexual overtones
> to it.  In addition, Trooper Heidi Wysocki heard only that Ms.
> Witt worked hard spreading.

> It is clear by the strained relationship between Ms. Witt and Zone Sergeant Segrue that any statement that he may have made, regardless of his intent, it [sic] was perceived by Ms. Witt as inappropriate.  Zone Sergeant Segrue has an obligation and a duty to refrain from making any comment or engaging in any action that could be perceived as creating a hostile work environment.  This is not only true with Ms. Witt, but his comment about Investigator Jackson to Trooper Murray and his words and actions directed towards Investigator Jackson at the promotion party.

Dkt. #33, p.68.  Staff Inspector Wood recommended administrative action against Z/Sgt. Segrue.  Dkt. #33, pp.47 & 68.

Captain Moffe voluntarily transferred from SP Jamestown to SP Horseheads on June 13, 2002.  Dkt. #28, ¶ 3.

On July 3, 2002, Ms. Witt requested restoration of the 4.5 days of sick leave she used to combat the stress of her work environment.  Dkt. #54, ¶ 56.  Ms. Witt believed this was fair as the cause of her stress, Z/Sgt. Segrue, was on paid leave pending resolution of the complaints against him.  Dkt. #54, ¶ 56.  Although the Troop Commander for Troop A recommended reinstatement, the State Police Director of Personnel advised that

> we are unable to comply with Ms. Witt's request because the Division has no legal or contractual basis to restore her lost time, unless Ms. witt files a job-related stress claim through our Workers' Compensation Carrier . . .
>
> Ms. Witt is to be personally informed of the contents of this memorandum and also advised that the mere filing of a claim does not in and of itself make it compensable.  Her claim may in fact be controverted by the State Insurance Fund, and if Ms. Witt desires to pursue it, she would need to

> provide medical evidence to the Workers' Compensation
> Board who will determine the compensability of her claim at
> a hearing.

Dkt. #57-3, p.77.  Ms. Witt responded in a letter stating: "To make me endure the

further stress of a Workmens' [sic] Compensation hearing with still no guarantee of

reinstatement of my sick leave, is seemingly retaliatory on the part of the New York

State Police."  Dkt. #57-3, p.79.


        On August 31, 2002, Z/Sgt. Worrell was issued the following letter of

counseling:

>      Investigation into this [complaint against personnel]
> revealed that you received information from Communication
> Specialist Karen Buvoltz relevant to an ongoing personnel
> investigation involving Trooper . . . and Sergeant Melissa
> Schreader.  You then questioned Sergeant Schreader in the
> presence of Investigation Bernard Feldman who had no
> involvement with the personnel investigation.
>
>      The allegations against you are unsubstantiated except
> your having discussed the pending insubordination
> complaint in the presence of Investigator Feldman.  When
> you discussed the pending matter in the Investigators' [sic]
> presence, you violated Regulation 8F2 in that you revealed
> confidential information regarding a Complaint Against
> Personnel with a person not officially entitled thereto.  You
> are counseled in this matter and in the future [sic] ensure
> personal [sic] matters are kept confidential.

Dkt. #57-2, p.89.  Z/Sgt. Segrue's personnel record indicates that this

disciplinary/personnel complaint was deemed founded.  Dkt. #57-4, p.4.


        Z/Sgt. Worrell received satisfactory job performance evaluations both

before and after this incident, and received letters of commendation in 2003 and 2004.

Dkt. #33, ¶ 13.  Z/Sgt. Worrell took the lieutenant's examination for promotion in 2001, and scored 50.57, placing him 32nd out of 59 on the eligibility list.  Dkt. #35, ¶ 2.  When the 2003 list became effective, appointments had reached number 28 on the eligibility list, an individual with a score of 52.255.  Dkt. #35, ¶ 2.  Z/Sgt. Worrell did not take the 2003 or 2005 examinations.  Dkt. #35, ¶ 3.

On October 4, 2002, Z/Sgt. Segrue pled guilty to a disciplinary charge of failure to properly report a non-physical domestic dispute, but denied the allegations contained in the personnel complaint relating to Ms. Witt.  Dkt. #33, p.20.  He was censured and suspended without pay for fourteen days.  Dkt. #33, p. 22.  As far as the State Police were concerned, this disposition also resolved the personnel complaint relating to Ms. Witt's personnel complaint.  Dkt. #33, p.28. Ms. Witt was never informed of the resolution of her complaint.  Dkt. #54, ¶ 63.  Z/Sgt. Segrue was transferred to Troop A in Olean, New York effective October 23, 2002.  Dkt. #26, ¶ 30.

Plaintiffs' complaint alleges that: (1)  Ms. Witt was subjected to a hostile work environment by Captain Moffe and Z/Sgt. Segrue because of her gender and that the State Police knew of the hostile work environment, but did not stop it or prevent further harassment of plaintiff; (2) Ms. Witt was subjected to retaliation after she reported the hostile work environment; (3) Z/Sgt. Worrell was subjected to unfounded disciplinary charges and proceedings in retaliation for assisting Ms. Witt in the filing and investigation of her complaint of discrimination; (4) the retaliation by Captain Moffe and Z/Sgt. Segrue denied Ms. Witt her rights under the First Amendment; and (5) the

retaliation by Captain Moffe denied Z/Sgt. Worrell his rights under the First Amendment.
Dkt. #36-2.


## DISCUSSION AND ANALYSIS

### Summary Judgment

_____Summary judgment is appropriate "if the pleadings, depositions, answers
to interrogatories, and admissions on file, together with the affidavits, if any, show that
there is no genuine issue as to any material fact and that the moving party is entitled to
judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "In reaching this determination, the
court must assess whether there are any material factual issues to be tried while
resolving ambiguities and drawing reasonable inferences against the moving party, and
must give extra latitude to a pro se plaintiff."  *Thomas v. Irvin*, 981 F. Supp. 794, 799
(W.D.N.Y. 1997) (internal citations omitted).


A fact is "material" only if it has some effect on the outcome of the suit.
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Catanzaro v. Weiden*,
140 F.3d 91, 93 (2d Cir. 1998).  A dispute regarding a material fact is genuine "if the
evidence is such that a reasonable jury could return a verdict for the nonmoving party."
*Anderson*, 477 U.S. at 248; *see Bryant v. Maffucci*, 923 F.2d 979 (2d Cir.), *cert. denied*,
502 U.S. 849 (1991).


Once the moving party has met its burden of "demonstrating the absence
of a genuine issue of material fact, the nonmoving party must come forward with

enough evidence to support a jury verdict in its favor, and the motion will not be

defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of

conjecture or surmise." *Bryant*, 923 F.2d at 982.  A party seeking to defeat a motion for

summary judgment

> must do more than make broad factual allegations and
> invoke the appropriate statute.  The [party] must also show,
> by affidavits or as otherwise provided in Rule 56 of the
> Federal Rules of Civil Procedure, that there are specific
> factual issues that can only be resolved at trial.

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).


Pursuant to Fed. R. Civ. P. 56(e), affidavits in support of or in opposition

to a motion for summary judgment "shall be made on personal knowledge, shall set

forth such facts as would be admissible in evidence, and shall show affirmatively that

the affiant is competent to testify to the matters stated therein."  Thus, affidavits "must

be admissible themselves or must contain evidence that will be presented in an

admissible form at trial."  *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001), *citing

Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *see also H.Sand & Co. v. Airtemp

Corp*., 934 F.2d 450, 454-55 (2d Cir. 1991) (hearsay testimony that would not be

admissible if testified to at trial may not properly be set forth in an affidavit).


## Ms. Witt's Claim of Hostile Work Environment

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment

practice for an employer . . . to discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).

Title VII claims are not limited to economic or tangible discrimination, but encompass

the entire spectrum of disparate treatment, including claims of discriminatorily hostile or

abusive work environments.  *Harris v. Forklift Systems*, 510 U.S. 17, 21 (1993).  Thus, Title VII is violated when the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.  *Id.*  However, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview."  *Id.*  In assessing the existence of a hostile work environment, the Court considers the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Id.* at 23.

Plaintiff must also demonstrate that she was subjected to the hostility because of her membership in a protected class, *e.g.*, her sex.  *Brennan v. Metropolitan Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999).  Because everyone can be characterized by sex, and many bosses are harsh, unjust and rude, "[i]t is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination."  *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002).  "Otherwise, the federal courts will become a court of personnel appeals."  *Id.*  Thus, the Supreme Court has

> never held that workplace harassment, even harassment
> between men and women, is automatically discrimination
> because of sex merely because the words used have sexual
> content or connotations.  The critical issue, Title VII's text
> indicates, is whether members of one sex are exposed to
> disadvantageous terms or conditions of employment to
> which members of the other sex are not exposed.

*Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80 (1998).

It is clear from the voluminous record in this case that during the relevant time period, State Police Troop A – Zone III was suffering from a lack of leadership, low morale, and polarized cliques of suspicious employees.  It is not surprising that such an environment would be perceived as stressful and unpleasant.  Ms. Witt's complaints of Z/Sgt. Segrue's refusal to acknowledge her presence or greet her; dropping of papers in front of her rather than handing them to her; reluctantly agreeing to assist in moving her personal items to the new facility; and usurping her new office furniture are all examples of petty, unprofessional behavior on the part of Z/Sgt. Segrue.  Similarly, Z/Sgt. Segrue's comment that the communications specialist who was exhibiting performance problems could be transferred to Ms. Witt's position was understandably interpreted by Ms. Witt as an insult to the level of competence required for her position.  However, Z/Sgt. Segrue's statement that Ms. Witt was "too busy spreading," while interpreted by Ms. Witt and Trooper Wysocki as having sexual overtones, is questionable because no one heard the remainder of the statement, which Z/Sgt. Segrue claims was "too busy spreading rumors."  Assuming that a jury would agree with Ms. Witt's interpretation of this statement, it would be the only comment directed at Ms. Witt with sexual overtones.

With respect to the one incident of alleged harassment by Captain Moffe, there is no evidence to suggest that the underwear appeared on the hallway floor intentionally or that it was placed there to harass Ms. Witt.  While Captain Moffe's failure to immediately remove the underwear from the hallway floor permitted an already suspicious staff to speculate as to its origin and the sinister intent of the person who placed it there, suspicions that were fueled by Captain Moffe's own paranoia and dogged pursuit of the perpetrator after work hours, the incident was resolved within a relatively short time frame with Captain Moffe's disclosure that the underwear belonged to his daughter.

None of these incidents, considered separately or together, allege conditions sufficiently severe or pervasive to rise to the level of a hostile work environment for purposes of Title VII.  Moreover, there is insufficient evidence to infer that the incidents were the result of any sex-based hostility toward Ms. Witt.  Ms. Witt's own statement suggests that Z/Sgt. Segrue's poor behavior toward her could not be attributed "to gender or race specifically," but was the result of his "problem with my circle of friends."  Dkt. #33, p.71.  Furthermore, the record suggests that Z/Sgt. Segrue's behavior was condoned, or at least overlooked, by Captain Moffe not because of any animosity by Captain Moffe to women in general or Ms. Witt in particular, but because of Captain Moffe's friendship with Z/Sgt. Segrue and his less than exemplary supervisory skills.  Accordingly, it is recommended that the State Police's motion for summary judgment be granted with respect to Ms. Witt's claim of hostile work environment.

**Ms. Witt's Claim of Retaliation**

"Title VII provides that '[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [an employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" *Raniola v. Bratton*, 243 F.3d 610, 623 (2d Cir. 2001), *citing* 42 U.S.C. § 2000e-3(a).  "The objective of this section is obviously to forbid an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice."  *Manoharan v. Columbia Univ. College of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988).

To establish a *prima facie* case of retaliation, a plaintiff must show: (1) participation in a protected activity known to the defendant; (2) an employment action

disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action. *Wimmer v. Suffolk County Police Dep't*, 176 F.3d 125, 134 (2d Cir.), *cert. denied*, 528 U.S. 964 (1999).   Complaining of discrimination to one's supervisor constitutes protected activity. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000).  With respect to the second element, the Supreme Court of the United States has determined that, in the context of a claim of retaliation, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Kessler v. Westchester County of Dep't of Social Servs.*, 461 F.3d 199, 207 (2d Cir. 2006), *quoting Burlington Northern & Santa Fe Ry. Co. v. White*, __ U.S. __, 126 S.Ct. 2405, 2412-13 (2006).  If the plaintiff meets this burden and the defendant then points to evidence of a legitimate, nonretaliatory reason for the challenged employment decision, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation.  *Cifra v. General Electric Co.*, 252 F.3d 205, 216 (2d Cir. 2001).

Ms. Witt alleges retaliation by the State Police as a result of Captain Moffe and Z/Sgt. Segrue's interference with the investigation of her complaint and spreading of false rumors that she was having an affair with other members of the troop.  Dkt. #61, p.35.  She also claims that Captain Moffe instigated the underwear incident and that the State Police denied reinstatement of her sick time in retaliation for her complaint of a hostile work environment.  Dkt. #61, p.35.

Ms. Witt's allegations that Captain Moffe and Z/Sgt. Segrue circulated rumors that she was having an affair are speculative and, in any event, such rumors appear to predate Ms. Witt's complaint of discrimination to Z/Sgt. Worrell.  Dkt. #36-9, pp.39-41; Dkt. #60, ¶¶ 60-64.  In addition, the Court fails to perceive how Captain

Moffe's placement of the underwear on the hallway floor could have any correlation to an individual's resolve to pursue a discrimination complaint.  Finally, it is difficult to fathom how Captain Moffe's alleged interference with the investigation of Ms. Witt's complaint could have had any impact on a reasonable employee given that the record demonstrates that Ms. Witt remained at her desk performing her job while Z/Sgt. Segrue was transferred out of Ms. Witt's work environment within 32 days of Z/Sgt. Worrell's e-mail to human resources and Captain Moffe was transferred out of Ms. Witt's work environment within 56 days of the underwear incident.  Finally, the Court fails to see any correlation between the complaint of discrimination and the denial of Ms. Witt's request for reinstatement of sick leave.  *Cf. Terry*, 336 F.3d at 147 ("The denial of restoration of lost leave time is not sufficient to support a retaliation claim, however, as it is legally insufficient to constitute an adverse employment action.").  As a result, it is recommended that the State Police's motion for summary judgment be granted with respect to Ms. Witt's claim of retaliation.

**Z/Sgt. Worrell's Claim of Retaliation**

Z/Sgt. Worrell alleges that the State Police retaliated against him by subjecting him to false disciplinary charges and finding one of those charges to be founded.  Dkt. #61, p.35.

The State Police responds that conducting an investigation into a complaint of misconduct does not constitute and adverse employment action.  Dkt. #61, p.29.  The State Police also argues that the outcome of the investigation fails to rise to the level of an adverse employment action because Z/Sgt. Worrell was not subjected to discipline, but only received a counseling memorandum.  Dkt. #37, p.31.  Finally, the State Police argue that the counseling memorandum was the result of misconduct by Z/Sgt. Worrell which was unrelated to his complaint against Z/Sgt. Segrue.  Dkt. #37, p.30.

In the instant case, there is a question of fact as to whether Captain Moffe's decision to initiate the personnel complaint against Z/Sgt. Worrell was a reasonable use of the disciplinary procedures within the State Police or was in retaliation for Z/Sgt. Worrell's complaint against Sgt. Segrue.  Within 20 days of his e-mail to human resources, Captain Moffe told Z/Sgt. Worrell that it was very unfortunate that he had filed the complaint.  Dkt. #56, ¶ 26.  Approximately one month later, Captain Moffe initiated a personnel complaint against Z/Sgt. Worrell even though Captain Coots and Investigator Hoffman believed that the facts did not warrant a personnel complaint and communicated that opinion to Captain Moffe's superior, Major McManus.  Dkt. #57-2, p.62.  Retaliatory intent against Z/Sgt. Worrell can also be inferred from Investigator Feldman's perception that Captain Moffe threatened to initiate a personnel complaint against him if he attempted to defend Z/Sgt. Worrell during his interview with respect to that personnel complaint.  Dkt. #58-2, pp.25-26.  *See DeCintio v. Westchester County Med. Ctr*, 821 F.2d 111, 115 (2d Cir.) (internal citations omitted), *cert. denied*, 484 U.S. 965 (1987) ("Proof of causal connection can be established *indirectly* by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant.").

Finally, the Court notes that this is not simply a case of an individual receiving a counseling memo.  Rather, Z/Sgt. Worrell's personnel file indicates that a disciplinary/personnel complaint against him was founded.  Dkt. #57-4, p.4.  The Court has little difficulty finding that a reasonable employee could be dissuaded from making or supporting a charge of discrimination by the prospect of a notation in his personnel record of a founded disciplinary/personnel complaint for an infraction which warranted nothing more than a memorandum of counseling.   As a result, it is recommended that

the State Police's motion for summary judgment be denied with respect to Z/Sgt. Worrell's claim of retaliation.

## Ms. Witt's Claim of First Amendment Violation

Ms. Witt asserts that Captain Moffe and Z/Sgt. Segrue violated her constitutional right to freedom of speech and freedom of association by subjecting her to retaliation and harassment for having filed a complaint against Z/Sgt. Segrue.  Dkt. #36-2, ¶ 99.

Captain Moffe and Z/Sgt. Segrue argue, *inter alia*, that Ms. Witt's speech regarding Sgt. Segrue's conduct toward her was not protected speech because it addressed her personal grievance rather than a matter of public concern.  Dkt. #27, pp.9-13; Dkt. #39, pp.10-17.

"It is well settled that a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression."  *Garcetti v. Ceballos*, 547 U.S. __, 126 S.Ct. 1951, 1956 (2006) (internal quotation omitted).  The Supreme Court of the United States

> has made clear that public employees do not surrender all
> their First Amendment rights by reason of their employment.
> Rather, the First Amendment protects a public employee's
> right, in certain circumstances, to speak as a citizen
> addressing matters of public concern.

*Id.* at 1957.  Thus, the employee must establish, as an initial matter, that her speech may be "fairly characterized as constituting speech on a matter of public concern."  *Heil v. Santoro*, 147 F.3d 103, 109 (2d Cir. 1998), *quoting Connick v. Myers*, 461 U.S. 138, 146 (1983).   "The issue of whether certain speech is protected by the First Amendment is one of law for the court."  *Ezekwo v. New York City Health & Hospitals Corp*., 940

F.2d 775, 781 (2d Cir.), *cert. denied*, 502 U.S. 1013 (1991), *citing Connick*, 461 U.S. at 148 n.7.

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48. "As a general rule, speech on 'any matter of political, social or other concern to the community' is protected by the First Amendment. *Mandell v. County of Suffolk*, 316 F.3d 368, 383 (2d Cir. 2003), *quoting Connick*, 461 U.S. at 146. In contrast, "when an employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick*, 461 U.S. at 147. Complaints which are motivated by and related to an employee's personal grievances and individual employment situation generally fail to meet the standard. *See Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 143 (2d Cir. 1993); *Ezekwo*, 940 F.2d at 781.

In the instant case, Ms. Witt's complaints about Z/Sgt. Segrue were clearly made in an attempt to improve her individual work environment. As a result, her complaints are not entitled to constitutional protection. It is, therefore, recommended that Captain Moffe and Z/Sgt. Segrue's motions for summary judgment be granted with respect to Ms. Witt's first amendment claim.

## Z/Sgt. Worrell's Claim of First Amendment Violation

Z/Sgt. Worrell claims that Captain Moffe violated his constitutional right to freedom of speech by subjecting him to retaliation and harassment for his role in assisting Ms. Witt with her complaint against Z/Sgt. Segrue. Dkt. #36-2, ¶ 102.

Captain Moffe argues, *inter alia*, that Z/Sgt. Worrell's complaint is not entitled to protection under the First Amendment because it was made as part of his employment duties as an EEO officer.  Dkt. #27, p.16.

The Supreme Court has recently determined that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 126 S.Ct. at 1960.  In that case, Ceballos, a calendar deputy exercising supervisory responsibility over other lawyers within the Los Angeles County District Attorney's Office, was alerted by a defendant's attorney to inaccuracies in an affidavit used to obtain a search warrant.  *Id.* at 1955. Ceballos investigated the matter, relayed his findings to his supervisors, and prepared a disposition memorandum recommending dismissal of the case.  *Id.* at 1955-56. Despite his concerns, the prosecution continued and Ceballos was called by defense counsel as a witness during a hearing to challenge the warrant.  *Id.* at 1956.  Ceballos claimed that following these events, he was reassigned to another position, transferred to another courthouse, and denied promotion.  *Id.*  The Supreme Court found dispositive "the fact that Ceballos spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case," and held "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  *Id.* at 1959-60.

The Supreme Court emphasized that

The significant point is that the memo was written pursuant to Ceballos' official duties.  Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have

-30-

> enjoyed as a private citizen.  It simply reflects the exercise of
> employer control over what the employer itself has
> commissioned or created.

*Id.*  In addition, the Supreme Court recognized that

> Employers have heightened interests in controlling speech
> made by an employee in his or her professional capacity.
> Official communications have official consequence, creating
> a need for substantive consistency and clarity.  Supervisors
> must ensure that their employees' official communications
> are accurate, demonstrate sound judgment, and promote
> the employer's mission. . . . If Ceballos' supervisors thought
> his memo was inflammatory or misguided, they had the
> authority to take proper corrective action.

*Id.* at 1960-61.  Thus, "the First Amendment does not prohibit managerial discipline

based on an employee's expressions made pursuant to official responsibilities."  *Id.* at

1961.


As in *Ceballos*, Z/Sgt. Worrell's statements regarding Ms. Witt's complaint

against Z/Sgt. Segrue were made pursuant to his official responsibilities as an EEO

officer and cannot, therefore, be insulated from discipline by the First Amendment.

Accordingly, it is recommended that Captain Moffe's motion for summary judgment be

granted with respect to this claim.


**Z/Sgt. Worrell's Claim of Due Process Violation**

Z/Sgt. Worrell also claims that Captain Moffe violated his constitutional

right to due process with respect to the disciplinary proceeding initiated by Captain

Moffe.  Dkt. #36-2, ¶ ¶ 102-103.


Captain Moffe argues that Z/Sgt. Worrell has failed to allege, let alone

establish, any constitutionally protected property interest of which he was deprived.

Dkt. #27, p.19.

Z/Sgt. Worrell concedes that defendants followed the formal protocols in processing the personnel complaint, but claims that he was deprived of substantive due process.  Dkt. #61-1, p.42.

"[T]o state a substantive due process claim, a plaintiff must allege action by a governmental officer that 'is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'"  *Bullock v. Gerould*, 338 F. Supp.2d 446, 451 (W.D.N.Y. 2004), *quoting County of Sacramento v. Lewis*, 523 U.S. 833, 848 n.8 (1998).  Such allegations are clearly lacking in the instant case.  *See, e.g., id.* (collecting cases).  While it is questionable whether a personnel complaint was the most appropriate method of addressing Z/Sgt. Worrell's apparent lack of discretion in handling sensitive information regarding ongoing or potential investigations, or what the motivation was in initiating such a complaint, the resolution of this complaint after investigation with a counseling memorandum hardly shocks the contemporary conscience.  Accordingly, it is recommended that Captain Moffe's motion for summary judgment be granted with respect to this claim.

## CONCLUSION

For the reasons set forth above, it is recommended that Captain Moffe's motion (Dkt. #26), for summary judgment be **GRANTED**; the State Police's motion (Dkt. #30), for summary judgment be **GRANTED** with respect to Ms. Witt's claim of hostile work environment and retaliation, but be **DENIED** with respect to Z/Sgt. Worrell's claim of retaliation; and Z/Sgt. Segrue's motion (Dkt. #38), for summary judgment be **GRANTED**.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

ORDERED, that this Report, Recommendation and Order be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72.3(a)(3).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance.  *See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.  *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.

-33-

The Clerk is hereby directed to send a copy of this Report, Recommendation and Order to the attorneys for the parties.

**SO ORDERED.**

DATED:          Buffalo, New York
                September 6, 2007


                              **S/ H. Kenneth Schroeder, Jr.**
                              **H. KENNETH SCHROEDER, JR.**
                              **United States Magistrate Judge**